Thank you, Your Honor. I'm going to speak for eight minutes on the Richard Glovert issues and then give the rest of the time to the county. So, on our qualified immunity issue, I realize that that's been before the court twice. But here's why. I'll make two points on a qualified immunity. Number one, we cited the White v. Pauley case from the U.S. Supreme Court, which says, hey, you know, you have to look at these qualified immunity cases where you have a case that's factually similar in order to reach the clearly established prong of qualified immunity. In the 2011 opinion, which was from an appeal from judgment on the pleadings, our denial of qualified immunity as of the 14th Amendment, the court never actually looked at the statute, 253.0405, and instead gave us two cases, a replevant case and a civil forfeiture case, none of which involved an authorizing statute for a public administrator or anything even close. And so, Mr. Glovert, as he goes into this house, he's called by the Deputy Ortiz to enter the house, secure the property, which is what he's required to do under the statute. All he's trying to do is follow the statute. Well, let's assume for a second, because we're talking about 14th Amendment qualified immunity here. Your client got Fourth Amendment qualified immunity. You don't think it's clearly established that you can't keep the property and never give it back to the heirs? I think if we're talking about a substantive due process, that would be true. Well, we're talking about a due process allegation in this case that appropriate notice wasn't given and that thereafter your client retained the property, hid it from them, and sold some of it at auction improperly, which is a deprivation of property. Do you really claim that there's qualified immunity for that action? So the way that the 14th Amendment claim was articulated, it was just on the pre-deprivation notice that that wasn't given. That wasn't given because the statute makes it an exigent circumstance if there's no one there to go in a house. Does the statute talk about exigent circumstance? It doesn't use the word exigent, but in Sub 1 it says if there are no relatives to protect the property and failure to do so could endanger the property. No one was going to come for at least a full day. So what prevented your client from going to a court and getting an order? Late at night. He could have gone the next day. I don't know if he would have been able to get the order. How many days did he know that the property – he learned of the death on the day that the deputy entered the house, correct? And he knew that no one was going to come the next day. The next day or the day after. And how many days after he learned did he enter the house? I think he entered it the very next day, Your Honor. So he had a full day between the time that he learned and the time he entered the house. I don't know if it was a full day, but it would have been within two different days. That's correct, Your Honor. So why isn't it clearly established under those circumstances, under our case law, that you need to go to a court to get an order to enter the house? Because there's plenty of situations, Your Honor, where pre-deprivation notice is not required and instead you can have post-deprivation notice. When was post-deprivation notice given here? By the time the brothers came, the Mathis brothers, they had already started making allegations. The property that Glover had in his possession – Well, they learned he had taken the property. My question was, when did your client give notice? Ever? He didn't, Your Honor. He didn't. Isn't it clearly established that a public official taking property from someone must give some notice to people whose existence he knows of? It's not in the statute, Your Honor. That's not what I'm asking. I'm asking constitutionally. Isn't it clearly established that a public official may not take property without some notice? I agree with you on that point, Your Honor. I just don't think post-deprivation he was ever given an opportunity to because as soon as the brothers came, the word that Glover used is that they became hostile towards him. When was the property removed to the storage locker? It was removed the same day he was there, so there was the passing. When he knew that the brothers were coming but not there. He knew that they were coming, but he knew that there was going to be a delay, and so that's why he wanted to secure it. There was an unlocked door. Okay, but he comes in the day or so after he learns about the father's death following a well-being check. He gathers up the property, takes it to his own storage locker. Did he ever inventory it? Yes, there is an inventory list. When was that created? That was created around that same time, Your Honor, because when he gave the property back and the inventory list. When he gave some of it back. Right, that's correct. The inventory list and the inventory, that's when the Mathis brothers said, Hey, wait a minute. If I understand what you're describing factually, he removes the property before the sons are scheduled to arrive, takes it to his own storage locker, puts it in, and at that, roughly that time, inventories what's in the locker, correct? Correct. Did he ever give that inventory to the brothers? I believe he did, Your Honor, and that's how they found out that there were discrepancies, and then they asked for the sheriff to investigate and eventually file their lawsuit. I thought the record in this case was that while your client had a routine practice of photographing items, he did not do so in this case. What he testified to at trial, Your Honor, is that the batteries in his camera had died, and he didn't have any spare batteries. Whether or not the jury believed him is sort of a separate question, but he did not photograph in this case. That's correct, Your Honor. And then I want to get the chronology straight. The Mathis brothers show up, and they say, essentially, give us back what you took. Yes. And your client says no, correct? Well, I don't think that's accurate, Your Honor. Well, what does he say? Does he say yes? Well, they hired an attorney, and he gave it back to their attorney who they had hired. How long did it take for them to get their property back? I'm not sure exactly on that timeline. So my question still remains. You say, look, I was justified in temporarily securing the property. They show up and say, let us have the property, and your client says what? He says, you know, here it is, I'll give it to you. Oh, no, your client says, you're being hostile, get your attorney to call me, and then you give back some of it but not all of it. Isn't that what happens? I agree with that, Your Honor. Why isn't that a 14th Amendment violation? Well, if someone comes to, you know, where the brothers came to Glover and they said, you know, we're talking about a criminal investigation, we're talking about a lawsuit, and he wants to give this property back. His inventory was wrong. I mean, I'll agree with that. His inventory was wrong. There was a bow missing by his own admission. And how was he supposed to give them notice? I mean, what would notice look like? Here's the inventory. Well, a good place to start would be a complete and accurate inventory, correct? Correct. And he didn't provide that. He did not provide that, correct? That's correct. He provided the inventory, but the inventory was incorrect. So as some of the property that was taken by your client, the Mathis brothers, the heirs, if you will, never received notice that it was taken. They inferred that it was taken because they knew it was there and it wasn't there anymore, but your client provided no notice whatsoever that he took some of the property. And beyond what he did, I'm just not sure what else he could have done in terms of providing that notice. Your Honor, I see that my time that I had allotted to my client. Well, let me just ask a question. Yes, Your Honor. You want this court to revisit the 2011 decision. Is that right? Well, not necessarily the 2011 decision, because the 2011 decision makes an assumption that the door was locked and it was secured and he had no reason to enter. The 2011 decision was based on the allegations of complaint. The testimony at trial from Ortiz and Glover was that the door didn't have a lock on it. And so that's why they were there. Was there any contrary testimony that it had a lock? No, Your Honor. But you're still asking us, if not to revisit both of them, to revisit the first one. Yes. The 2011 is the first one. The court said in 2011 your client does not have qualified immunity. And so it's basically a similar qualified immunity analysis, but based upon the facts at trial. That's how it's different. But if the facts at trial, you're saying the facts at trial were uncontested and the judge, therefore, should have granted you qualified immunity at the end of the plaintiff's case? Based upon either a mistake in law based on the statute or a mistake in fact. It should have been, if it was a mistake in fact. Well, see, I'm trying to figure out what's new here. And so if we made a mistake in law in the past, I think you're stuck. If we got the facts wrong in the past, you may be stuck. I'm trying to figure out, did something happen at trial that undermined the qualified immunity analysis? So this is, we've outlined these on page 12 of our reply brief. And it's basically the mistakes in fact, which should have made it a jury question based on the Torres versus Madera case. Whether that door was unlocked was a big deal because that's why Glover went and secured the property, why he entered the property. But that's a Fourth Amendment issue. On the notice issue, what difference does it make whether the door was locked or unlocked? Well, it's because he was carrying out a statutory duty to secure the property. So if the door is unlocked and he has no Fourteenth Amendment obligation to give notice, but if it's locked, he does? I would argue, Your Honor, that he had no obligation to do it pre-deprivation notice under the Fourteenth Amendment. But this Court said previously that you don't win on that one. You don't get qualified immunity for that. And so now you're saying, well, what we didn't know was the door was unlocked. And my question is, what difference does that make on the Fourteenth Amendment issue? Well, we did know that, but in 2011, the opinion based the facts upon the allegations and complaint. Your Honor, I really do need to sit down because I want to give the county a chance to say their part too. Fair enough. Thank you. Thank you, Your Honor. May it please the Court, Brian Brown on behalf of Lyon County. Your Honor, I believe Lyon County faced two separate claims at trial and leading up to trial. That was a Fourteenth Amendment claim that Your Honor has already talked to counsel about and a Fourth Amendment claim. Prior to trial via summary judgment, the Court granted summary judgments to the plaintiff on the Fourth Amendment claim and made several findings, including the finding that the plaintiffs had a privacy interest in the home in which this property was located. Another finding that the Court made in that motion for summary judgment was that Richard Glover, in carrying out that specific act, was acting as the final policymaker for Lyon County when he did so. We proceeded to trial on that issue with liability established, so the Fourth Amendment issue at trial was merely a damages issue. Right. That was tried to the jury. The Court initially held that there was an issue of fact related to the Fourteenth Amendment claim as regard to the county. At the close of the plaintiff's case, the Court granted a directed verdict and found that Mr. Glover was also a final policymaker with regard to a specific act of the no prior notice entering the home. Right. So let me just summarize this, because I want you to get to the point. With respect to the county's liability, it was premised entirely on the notion that Mr. Glover was the final policymaker. Absolutely. There was no separate allegation that the county by itself did something. So its liability occurs because Mr. Glover, in the Court's view, violated the Constitution or the jury's view in the county. He was the final policymaker with respect to the county. That was the sole avenue to find liability. Right. So focusing on that part of it for a second, not on the privacy interest part of the Fourth Amendment claim, why wasn't he the final policymaker? Your Honor, and we've touched upon it already a little bit in the argument. If you look at the precedent cited in the brief, you have to look at the statutory scheme related to the place. The Court looked at that, and we've all looked at it. So if he wasn't the final policymaker with respect to how he exercised these functions, who was? The natural question. Thank you very much. Your Honor, how we've postured the argument in the brief, with regard to Lyon County, he was not a final policymaker on behalf of Lyon County. He was. As to what? With respect to the acts that he undertook, for which he was found liable and for which you were found derivatively liable, who was the final policymaker? I think your question is very broad, and I think the analysis of the case law is a bit more specific. If he's not the final policymaker, it seems to me, I may be very simplistic with this, there must have been a final policymaker other than him. And so tell me who it was. With regard to the statutory policies, or the statutory guidelines that created the public administrator, the county was the final policymaker with regard to certain enumerated responsibilities. They were able to be the final policymaker on investigation of any claims that were made against him. They were also the final policymaker in regard to whether or not they would require reports that would be generated to him to make sure that. I asked a specific question. I did it on purpose. With respect to the acts that he undertook, who was the final policymaker? The final policymaker under that analysis, under what he took in the case of going into the home and not providing notice, that is the state of Nevada is the final policymaker. The state itself? There's no person? There is no state public administrator that oversees him. No, there is not. But the state articulated through statute the specific act for him to do. Lyon County did not enact any ordinance or direct any guidelines or anything with regard to his authority to go in to do this. I agree with that. That's why I'm having difficulty. Let me finish. When he's acting, it would be him acting as the final policymaker for the state. Please let me finish. I agree the county didn't do any of those things, which is why it's hard for me to believe that the county was the final policymaker. And I think the policymaker probably has to be a person, not an entity. But why is this? All the state did was pass a statute, correct? Well, the state could make the statute, and the state can give with regard to those two issues. The state made the policy. The person is Mr. Glover himself, but not as a final policymaker for Lyon County, as a final policymaker for the state of Nevada. So your argument is that he was acting in effect as an agent of the state here, not of the county? Yes. Yes. He's elected by the county voters. He's paid by the county. Why does that make him an agent of the state? Because this issue, Your Honor, is really a state policy that is driven by statute. The Nevada legislature has determined that individuals that die unaccompanied, without anyone around, they wanted to make sure the citizens of the state were protected with regard to their property. So they created a system in which each county, based upon where property may be located, would have a publicly elected public administrator. What did the state tell Mr. Glover with respect to whether or not he should give notice, inventory items, not return them to the heirs or sell them at public auction? What did the state tell him about that? Throughout the statute, there's guidelines on what they're supposed to do. I've read the statute. What did the state tell him about that? There's no direction by the state. The state is not giving him any direction. The state's direction is he gets to make policy, doesn't he, as to how he's going to execute those duties. Right. On behalf of executing the policy and the statute of the state of Nevada, not an ordinance or anything to do with Lyon County. You just can't look at the fact that it occurred in Lyon County, that it's named the Lyon County administrator. You have to look at the specific authority for what he was acting under. And what he was acting under was purely the statutory authorization. When he is notified of an unattended death, he is to come to that property. He is to secure that property. He is then to do the proper proceedings to ensure that an estate is opened in the state court. And at the same time, simultaneously, he's going to do an investigation. I mean, you don't know. When he arrives, he doesn't know if there's a will, if there's what the status of the property is. At the moment Glover came to the property, and hypothetical question, he had some doubts about what to do. The law enforcement has told him that the father has passed away. He believes that the door is not locked and that there's items inside the home of value. If he had taken out his cell phone and called someone to get directions on what to do, who would he have called? There was no one to call. Because he had the final authority. Via the state statute on behalf of the state of Nevada. Is he the county employee? He's not a county employee. He's not paid by the county. He is elected in the county. He is a separate elected official. He is not paid. He's not an employee. He's got no benefits. What's his title? The title is Lyon County Administrator. But as the court has held – But that doesn't mean anything. It doesn't. It's not controlling in the decision. If you look at the McMillan decision, the name of what you call a person in the government is not controlling on where their authority comes from and who they're acting on behalf of. If the state's statutory scheme and failure to put someone else for him to report to doesn't automatically then come to Lyon County, the statute created certain obligations, which Lyon County did with regard to the public administrator. It didn't have anything to do with directing him or anything else related to going into these homes and how he did his job pursuant to that statute. It had nothing to do with that. What is the purpose of filing the reports? Why would the administrator file the reports with the county? I think those reports would serve the purpose to ensure that estates were being opened, that ensure that estates were being closed. Well, that at least suggests that the supervisors were exercising some authority over the administrator, wouldn't it? As I've said, pursuant to those parts of the statute that gave them the authority to act,  They didn't have the authority. You've got two alternate arguments and you're entitled to make them. One is that he was an agent of the county and the county, he wasn't the final policymaker. The Board of Supervisors was. Your second argument is the county had nothing to do with him. It was the state that was the ultimate policymaker. And you're entitled to make both of them. It's just hard to mesh them. Well, I think when you look at the analysis, especially in the McMillan case, you will see that that is a proper analysis, that you look to whether or not that they are acting pursuant to the authority that is given to them by the state or the county. The county granted him no authority. The county had obligations. No, I understand your point. But you also do argue in your brief that the County Board of Supervisors was the ultimate policymaker. On issues that they were allowed under law to exercise that power. And they're not authorized to dictate to him under the statute all the things related to going into the home and to providing notice. We've taken you over, but I had a factual question for you. And there are several others. I know, but that's why we have a clock. The award of emotional distress damages against a county is quite large. But you don't, your brief on appeal, unlike below, doesn't attack those numbers. Is that right? That's not an issue for us on appeal. You attack the judgment, but you don't say if the judgment was correct, the verdict is outrageous. We do attack that. Well, where? Tell me where in your brief. We attack that in the errors committed by the court with regards to evidence that they allowed in. Right. And we show that that is the basis for those awards. I understand. What you're saying is you're not, what you're not saying is that if the judgment against you was appropriate, that the jury awarded too much money. I think we are saying that. No, you're saying we should reverse the judgment because the judge let the jury hear inappropriate evidence. And the improper evidence is what influenced the high number. If you can show me, perhaps you can tell me where that's in your brief. I don't think we did go, if you look at the initial brief, I can tell you what section. It's an evidentiary argument. You say the jury heard a bunch of stuff they shouldn't have heard and shouldn't have been allowed to do. Right. That's a separate, therefore the judgment should be reversed. You don't ever say, but even if the judgment shouldn't be reversed, the number should be reduced. Am I correct in summarizing that? That's correct. We did not make that specific analysis. You may be right that it should be reversed. May I have one moment on the issue of the error and what happened? If you look at the trial record in this case, on summary judgment, the county was successful in obtaining a judgment that under state law there was no duty to train, supervise a publicly elected official. Right. You weren't held liable. That wasn't the Minnell theory on which you were held liable. They never pled a Minnell theory. We fought through the entire trial with regards to... There has to be a Minnell theory. You're not liable for constitutional violations. They didn't provide a theory on failure to train under Minnell. Right. That's right. I'm going to cut you off here, but the Minnell theory on which they prevailed was that Mr. Glover was the final policymaker for the county. That's correct. That's a Minnell theory. And the judge made those rulings. That's correct. That's a Minnell theory. I understand that. I misspoke, Your Honor. So you're right. You're not on the hook for failure to train. That's correct. And what happened at trial, from the opening statements through the witnesses, the plaintiffs continued to tell the jury that Lyon County failed to direct, that Lyon County failed to give information and training through the district attorney's office. Continuously through the trial, they do that. And at the conclusion, I requested the court to provide a jury instruction consistent with his legal ruling that said that there is not a claim and the county cannot be held liable for failure to train or supervise Mr. Glover. The court amazingly advocated that back to me. Finish up right now. And there is no way that would be contradiction. If I was to tell the court or tell the jury what the law is that governs the case, that's in direct contradiction to the very first jury instruction that the court gives where the court says, I provide you the law. And it's also in violation of the very next statute or the jury instruction that states that the arguments of counsel are not the law and the facts. It's what you heard. And you are in at least seven minutes violation of your time. Yes, sir. Thank you. Thank you. Good morning, Your Honor, and may it please the court. My name is Brian Irvine. I'm here on behalf of Richard Mathis individually and as trustee of the Mathis Trust and on behalf of Anthony Mathis individually. As Your Honor has noted, this is the third time this case has been up on appeal before this court. It's an 11-year-old case that involves egregious constitutional violations by the final policymaker, Richard Glover, who is the public administrator for Lyon County. Mr. Glover entered the Mathis home after the death of Joe Mathis without a warrant. He effectuated an unconstitutional search and seizure of property, and he did so without providing the Mathis brothers notice and an opportunity to be heard. Well, let's talk about the search and seizure claim. Mr. Glover got qualified immunity on the Fourth Amendment claim, correct? He did, Your Honor. And one of the — but the county didn't. Correct. Because the county can't get qualified immunity. I'm having trouble figuring out why, under our case law, any of the individuals or the trust had a reasonable expectation of privacy with respect to the search, not the seizure. The seizure is a separate issue. We have this case called United States versus some amount of currency. I forget what the amount is. United States versus currency. And in it, a woman says, I've got standing to object to, in that case, a warranted search. But it really doesn't matter. Because it's my mother's house, and I kept stuff there, and I had a key. At least with respect to everybody but the brother who claims that he was also farming, doesn't that dispose of the individual expectation of privacy? No, Your Honor, for a number of reasons. First, procedurally, Lyon County has failed to preserve its argument that the plaintiffs did not have an objectively reasonable expectation of privacy. Why did they brief the heck out of it? How did they not preserve it? Well, they briefed the heck out of it, but they missed it at the summary judgment stage. If you look at our supplemental excerpts of record at page 71, you'll see that they briefed the subjective expectation of privacy, but not the objectively reasonable expectation of privacy. Okay. Let's assume you don't pull that off. Okay. Let's assume we don't pull that off. So let's assume we have to address it under merits. Then, Your Honor, you go to the number of cases that we cited in our brief, the Jeffers case, the Davis case, the Waller case, and the Harwood case. But I've read all those cases. We have a case that says merely the fact that you store property in your parents' home and have access. In that case, the woman had a key. I don't know whether your clients had keys or not, but not part of the – I can't find that in the record. They visited occasionally is what you said. They did. So how can you distinguish that case? You can tell me you cited cases that you think support your proposition, but I think I've got a case on point here. Tell me why I'm wrong. Well, Your Honor, I think it was they had ownership of the property at issue. They had permission, as you said, to store the property from their father. How did they have ownership? They had ownership of the property that was subject to seizure. Right. So did the woman in the currency case. Sure. They also had permission from their father to enter the premises and to check on their property from time to time. How did the woman in the currency case? Well, Your Honor, I think that the fact – I think that we would simply rely on Jeffers. If that case that you're talking about distinguishes Jeffers sufficiently, then I would say that that's an issue. But I don't think that Lyon County has preserved this issue on appeal for a couple of reasons, as I said before. It just simply wasn't before the court at the summary judgment stage properly such that the facts could be developed for appeal. They simply didn't present the proper evidence to the court at summary judgment, which didn't then raise the – they didn't raise the argument. It didn't allow us to prevent – provide declarations and the like. I understand. It wasn't an issue at trial. I understand your waiver argument. I'm not sure. Is that a waiver argument? That's a waiver argument, Your Honor. Preserved in your briefs? Yes.  It's presented in our briefs. I'm interested in how your damages occurred in this case and what the judge instructed the jury about. Okay. Let me give you a hypothetical. Okay. You don't have to tell me this isn't what occurred because it's a hypothetical. Let's assume the sheriff, the public administrator, did precisely what he did. Yes. And your client showed up the next day and he said, here's all your stuff back. I just took it so it would be safe. Mm-hmm. But he had provided no notice of what he – you know, before he entered or got no warrant. Would your clients have any damages? I think we would have nominal damages under the case law. I think that's probably right. Right. The judge instructs the jury, it seems to me, that your damages flow from the 14th Amendment violation of failure to give proper notice. And so I'm trying to figure out why the failure to give proper notice gave rise to the large amount of damages that your clients had as opposed to the subsequent retention of the property and disposal of it, et cetera. Certainly. Well, I think the answer to that is that the constitutional violation, which is the administrative taking of the property without proper notice, was essentially the vehicle that allowed him to commit other torts, for sure, and it also allowed him to take the property in the first place. But for those constitutional violations, they wouldn't have been deprived of any of this property permanently. So your argument is that your damages, your emotional distress damages, don't have to simply flow from the initial violation. They can include things that occurred later on along the way. Well, I think it's all part and parcel. Yes. Yes? Yes. I think the jury can infer that from the circumstances here. Well, I'm not asking what a jury can infer. I'm asking a legal question. Okay. I'm asking if, let's just assume that improper notice was given. No notice. No notice was given. And that was a constitutional violation. Do your damages, are your damages limited to the damage that flows simply from not giving notice, or are they, or can you now recover all the damages that consequentially occur because the public administrator started off on an unconstitutional path? I think we can. You better say number two, because on number one, all you get are nominal damages. No, exactly. No, I think we get damages that flow from his not giving notice. Tell me what case law says that. Just bear with me for a minute, Your Honor. I know we cited some of it in our brief. I know the judge said when a motion for JMOL was brought, no, you get everything that flows from it. My question is really whether the jury was properly instructed. Properly instructed. Well, I don't believe that they have raised that issue on appeal, Your Honor. I think that would be a new issue here. They didn't argue that there was an improper jury instruction as to that issue. They simply said that the jury was inflamed by passion or prejudice. And obviously this court has to give deference to the jury's damages award as long as there's substantial evidence to support it, especially with regard to the punitive damages because the pain and suffering damages are so highly subjective. I don't think that there's an argument before this Court that there was an improper jury instruction with regard to punitive damages. Well, their argument's a little – their argument's really based on it. The argument says the jury was told that I've held as a matter of law that there's a constitutional violation by not giving notice. Correct. And you should award the damages that flow from that, roughly. Yes. And so the question is, do these damages really flow from not giving notice or do they exceed the sheriff was supposed to have done? Sheriff. The public administrator. Sorry, we always have a sheriff in these 1983 cases. I think they flow from not giving notice, Your Honor. The facts of the case show that Mr. Glover was notified that Anthony Mathis would be arriving in the area on May 30th. Mr. Glover got to the house at the dark of night on May 29th when he knew Anthony Mathis was going to arrive. He knew how to contact Anthony Mathis. He could have picked up the phone and called him, given him notice that he was going to do that, and Anthony Mathis testified that he certainly would have said no had he received that call. So but for that lack of notice, which allowed Mr. Glover to essentially creep into the property and take the property, none of this would have occurred. So I think the damages do flow from the constitutional violation of no pre-deprivation notice to the claims. Well, but I think what you're saying is that the constitutional damages flow from the fact that Mr. Mathis would have said no had he gotten notice. Would the fact that he said no have made any difference? We'll never know. I mean, he wasn't given that opportunity. I mean, so it's – I guess I'm just – my problem with this – one of my problems with this case is figuring out how all your damages flow from not getting notice as opposed – it's easy for me to figure out how your damages flow from the stuff that the public administrator did later. Sell – lose some of the property, sell off some of the property, you know, et cetera. But we would certainly argue that but for the constitutional violations, none of the other stuff could have taken place. So the damages, given the totality of the circumstances that the jury was presented with, there's substantial evidence to support the jury's findings on both the property damage, which was derived from a spreadsheet that had a high number, a low number, and a middle number. The jury picked the middle number. Judge Gordon found that reasonable below. And the emotional distress damages based on Mr. Glover's egregious conduct. Your Honor, I wanted to answer a couple of the questions that were there before. Judge Hawkins, I believe you asked a question about whether the property after Mr. Glover had taken it was removed to a storage locker immediately. It was not. He removed it from the property and placed it in the back of his pickup truck and left it in his driveway overnight, which he believed was more secure than where it was in the home. I just wanted to correct that for the record. Did he put it in a storage locker the next day? He put it in a storage locker the next – well, not a storage locker. It's basically a big metal building. Yeah. Yeah. He put it in there the next day. The inventory list that Your Honors were referring to, it's unclear exactly when that was created, but it was created several days later. And my clients obtained it from the Sheriff's Department, not from Mr. Glover himself. So only after – Can you tell us what the record shows, at least construed in the light most favorable to you, because you've availed a trial about what happened when your clients got there and asked for the property and what followed thereafter? Absolutely, Your Honor. Anthony Mathis arrived on May 30th and entered his father's home and found that it had been ransacked. He noticed immediately that quite a bit of property that he knew to exist and knew where it was in the house was missing. He immediately drove to a place where he got cell phone reception and called the Sheriff's Department and reported it. The Sheriff's Department then directed him to Mr. Glover and said that they thought Mr. Glover had been in the house. Mr. Mathis then went to Mr. Glover's facility and was told, here's all of your father's things. It was, frankly, a mess. There was a bunch of guns in one place. There were a lot of the late Mr. Mathis's personal papers kind of scattered all over the place, trust documents, all that kind of thing. At that point in time, was Mr. Mathis given the ability to take those things? No, Your Honor. Tell me what happened with respect to that. Mr. Glover told him, no, you can't take this property. I don't know if you have authority to take this property. I don't know who it belongs to. I believe at that point, Anthony Mathis telephoned his brother, James, who is here in court today and will speak shortly. Mr. James Mathis then got on the phone with Richard Glover who told him that, pardon my cursing, but I'm the public administrator. I'll do whatever I goddamn well please. He also offered to sell the plaintiff's property for them. Anthony Mathis realized right away that there were several guns missing. Mr. Glover told him this is everything. Only later, after he was confronted by law enforcement, did he sort of fess up and admit that there was other property in his facility, namely the archery bow that belonged to plaintiff Richard Mathis. Then obviously, later down the road, my clients were made aware of a public auction that the public administrator, Glover, was conducting where they found that a great deal of their father's personal items were being sold. Does the record in this case, look for it, does the record demonstrate that the items were actually sold or that your clients learned of an auction? They learned of the auction. They showed up at the auction with a video camera and a camera to take still photos. When they pointed out that this property belonged to their father, and in fact it was in boxes with Joe Mathis' name on it, it was that egregious, Richard Glover told them that if they wanted to get it back, they could bid on it. At that point, they contacted law enforcement. Lyon County sheriffs refused to take it into custody, but the Nevada Department of Public It wasn't sold. At the end of the chain of stuff, it wasn't sold. They got it back. They had to resort to other people to get it back. After many months, yes, Your Honor. I know that I'm reserving time for Mr. Mathis. I just wanted to touch very briefly on our cross appeals before I sat down. We believe the district court erred for two reasons. Number one, we think the district court erred in granting Richard Glover qualified immunity on the Fourth Amendment. The law of this circuit is that a warrantless search is per se unreasonable, absent exigent circumstances. At the pleading stage, which is where the lower court decided it, there were no allegations of exigent circumstances. Well, the Supreme Court's told us repeatedly, they must be right because they keep saying it, that we ought to have a case with some sort of particularity that involves this situation before we find a lack of qualified immunity. And all your cases are ones that stand for the familiar principle that absent an exigency, a warrantless search is presumably unconstitutional. Do you have a case that's close to this circumstance? No, not really, Your Honor. I mean, I think the difference between the cases that do find the exigency in this one is that this was not an emergency in any way. Richard Glover had a full day to think about this. He had a full day to reach out to Anthony Mathis or James Mathis and try to talk to them about this before he entered the home. He simply didn't do that. There was no emergency here whatsoever, based on the record, and certainly nothing at the pleading stage. Let me ask you a practical question. If your Fourth Amendment judgment against the county stands, does it matter that Mr. Glover had qualified immunity? No, it really doesn't, Your Honor. And certainly if this court were to affirm everything else, then affirming that decision would not be a luxury. And I suppose if we find that your clients didn't have an expectation of privacy, then the qualified immunity question goes away. I would concede that. Okay. I think you wanted to save time for your colleague. I did, Your Honor. Thank you very much. Mr. Mathis. May it please the Court. I'm James Mathis, appellee in pro per. Obviously, I don't have any training in law, but I can probably assist in answering some of these questions, as I'm probably the only one in the courtroom that was actually there. With regards to the lock on the house, I testified that the coroner told me on 10 p.m. on May 29th, when he told me my father died, that he told me he'd locked the door. He pushed a button on the push-button doorknobs and locked it. And I said, you can't get in that way. The doors are locked with padlocks. He said, well, that's what I did on both doors. The 10 ER 2329. Then when Tony Mathis arrived down there on June 1st, not May 30th, he had to jimmy the doors to get in. They were both locked. He had to use a pocketknife and a credit card. That's why my father wouldn't use those locks, because you could get in. Clever could have called us at any time along the way. He had our phone numbers. He had a cell phone. He testified he had a cell phone when he was driving back and forth to the property, which was an hour and a half. It wouldn't have taken an hour and a half to call us. There was no reason he didn't call us. In fact, he never called us once. There was no threats made. We wanted our property back and certainly would be upset, but there was no threats against Mr. Glover. He just said he wouldn't give the property back. In regards to the due process violation, it is, you may, a little difficult. When you come into your family's home, you find everything in that place has been absolutely stripped by a cockroach who has told you two days before that I don't give a damn what you think. I'll do whatever I damn well please. He stomped on us. He flat out violated the law. Glover was prosecuted as a county officer in the Liberty case, which I had to compel from Lyon County. In that case, he was prosecuted under Lyon County Code 1.06.02, well, 1.06.03 for a Lyon  County case. He was originally prosecuted as embezzlement for the same case. If that is the case, how can he not be, one, a Lyon County officer, and two, how can he not be a policymaker? Because he was being prosecuted for policy that he had not followed. I'm not sure the record tells us what was the outcome of that case. Of the Liberty case? Yeah. He pled guilty to a reduced charge of failing to follow the policies of the office, which pretty much says it all. I have a right to privacy, as you somewhat alluded to earlier. I was down there for, I've been there from, I lived there from 2004 to 2006. I was down there a lot. I fixed tractors. I set up an entire irrigation system. I was down there in April of 2006, planted trees for a whole week. I was there with my father. We went out and did all sorts of things. I had property there. I had firearms there. I had my tools there. Glover went in and stuck them all out, along with everything else that I remembered from the house. I had keys to the house, keys that I could use to the padlocks, right there. There is nothing in the record, although they say there are no keys to the house, I have them. I was there. I could come and go and I'd please, and if I would have been there, I would have removed Glover. I do have a right to that privacy under every citation that they listed in their briefs. The flashing red light tells you you're running out of time, so if you could sum up, I'd appreciate it. Oh, I'd just like this court to affirm what the district court decided as a matter of law. I don't believe the emotional distress damage is very excessive whatsoever. Thank you. Thank you. Thank you, Mr. Mathis. Thank you, counsel. This case will be submitted and the court will be in recess for the day.
judges: Hawkins, Hurwitz, Eaton